# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOAN PADULA, Individually and as Administrator of the Estate of Kurt Platzer, | ) ) ) | CASE NO. 4:10CV2876 |
| PLAINTIFF, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| TRUMBULL COUNTY, OHIO, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| DEFENDANTS. | ) ) | |

Before the Court is defendants' motion for partial summary judgment (Doc. No. 52),[1] plaintiff's memorandum in opposition (Doc. No. 67),[2] and defendants' reply (Doc. No. 76). For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part**.

## I.  BACKGROUND

**A.      Factual Background**

Plaintiff, Joan Padula ("plaintiff"), filed this lawsuit on December 21, 2010, on behalf of herself individually and as the Administratrix of the Estate of Kurt Platzer ("Platzer"). Plaintiff initially sued Trumbull County, Ohio, Trumbull County Board of Commissioners, Sheriff Thomas L. Altiere, Chief of Jail Operations Donald Guarino, Jail Assistant Wardens Eric Shay and Nicole O'Brien, fourteen corrections officers, Jail Medical Director Philip Malvasi, D.O., and medical assistants Annette Jordan, Michelle Stanec, and Adrienne Mackall. On May 9,

---

[1] The motion is supported by various depositions. (Doc. Nos. 54 through 63.)

[2] The opposition is also supported by the declaration of plaintiff's counsel (Doc. No. 67-1) and various depositions (Doc. Nos. 68 through 74).

2011, Padula voluntarily dismissed with prejudice all but Malvasi, Jordan, Stanec, and Mackall. (*See* Doc. No. 19.)

The complaint sets forth several causes of action. It asserts in the first cause of action a federal claim under 42 U.S.C. § 1983 for the deprivation of Platzer's rights under the Eighth Amendment to be afforded adequate medical care as a jail prisoner and to be free from excessive force. (Compl. ¶ 120.) Plaintiff alleges that Jordan, Stanec and Mackall were deliberately indifferent to Platzer's serious medical condition of alcohol withdrawal and alcohol withdrawal delirium by failing to provide adequate medical care and by failing to protect Platzer from the use of excessive force. (*Id.*, ¶ 121.) Plaintiff further alleges that Malvasi failed to adequately train and supervise his medical staff employees with respect to inmates who are at risk of withdrawal and skull fractures, including Platzer. (*Id.*, ¶ 122.)[3]

In addition to the federal claim, the complaint also asserts a wrongful death claim against all remaining defendants, a malpractice claim against defendant Malvasi, negligence against Jordan, Stanec, and Mackall, and loss of consortium.

All the causes of action are based on the following factual scenario.

In July, 2008, Platzer was convicted of drunk driving and placed on probation. He subsequently entered two different rehabilitation programs, but relapsed each time. (Compl. ¶ 31.) On June 26, 2009, Platzer showed up for a court appearance while under the influence of alcohol. He was sentenced to thirty (30) days in the Trumbull County Jail. He had never before been incarcerated. (*Id.* ¶¶ 33, 34.)

---

[3] The first cause of action also alleges a custom, policy and procedure of violating constitutional rights and a failure to train and supervise in the use of tasers. (Compl. ¶¶ 123, 124.) These allegations were clearly leveled only against the already-dismissed defendants and need not be considered by the Court.

Around 12:30 p.m. on Friday, June 26, 2009, Platzer was booked into the jail. Officer John Horton completed an "Officer Observation" record noting that Platzer had an "odor of alcohol." (Compl. ¶ 39.) Medical Assistant Jordan, who was working the 6:00 a.m. to 2:00 p.m. shift in the medical department, was called to booking to evaluate Platzer. According to policy, Jordan asked Platzer how much he drank and he answered, "A lot." In fact, he told Jordan that he drank a fifth of alcohol a day and that he had been drinking that day. Almost immediately after Jordan finished her question, Platzer leaned back and stiffened up, and then fell against Jordan's chest, going into a seizure. The booking officer came to assist her and they lowered Platzer to the floor. He had urinated on himself and had bitten the side of his tongue during this seizure, which lasted about a minute. During the seizure, Jordan took Platzer's heart rate and blood pressure and found both to be elevated. After the seizure, Jordan and the officer sat Platzer up. He asked Jordan why his pants were wet and she informed him that he had had a seizure. The officers then took him to shower and change clothes. (Compl. ¶ 40; Jordan Dep. [Doc. No. 58] at 918-19, 922, 923-24, 925-26, 929-30, 931.)

Jordan telephoned Malvasi, getting through to him immediately, and informed him about her encounter with the new inmate. She stated that when she met with Platzer in booking, he smelled of alcohol, admitted to a drinking problem (calling himself "a drunk"), and admitted that he had been drinking that day. (Jordan Dep. at 927, 929.) She also reported that he had a seizure in booking, which prompted Malvasi to inquire as to the duration of the seizure and what Platzer was doing during the seizure. (*Id*. at 933.) She told the doctor that Platzer was lying on the floor, twitching mildly, and that he had urinated on himself; she reported what Platzer's heart rate and blood pressure had measured. (*Id*. at 930, 933.) Malvasi told Jordan to start Platzer on the alcohol protocol at the next medication pass (which was 8:00 p.m.). The alcohol protocol

3

called for 60 mg of phenobarbital twice a day for four days, followed by 30 mg twice a day for two days. Malvasi also told Jordan to place Platzer in a cell in pod 3A, the medical and disciplinary unit. (Jordan Dep. at 927; Stanec Dep. [Doc. No. 63], Pl. Ex. 5.)

Following Jordan's call to Malvasi, Platzer was taken by officers to pod 3A. Jordan informed the officers that Platzer was a drinker and had been placed on the alcohol protocol; she also told them that Platzer had just had a seizure and that the doctor wanted him placed in a cell on floor three where he was to be monitored every ten minutes by corrections officers.[4] (Jordan Dep. at 936, 947-48.)

Jordan returned to the medical department to write her shift report.[5] She also wrote Malvasi's order for the alcohol protocol. When Jordan's shift ended at 2:00 p.m. on June 26, 2009, she informed the next medical assistant on duty, Michelle Stanec, that Platzer had arrived smelling of alcohol, that he had had a seizure, that she had taken his vitals, that she had called Malvasi, and that Platzer was in pod 3A. She also informed Stanec that, per Malvasi's orders, she should start Platzer on the alcohol protocol at 8:00 p.m. (*Id*. at 936-37, 956.)

Stanec's shift began at 2:00 p.m. on June 26, 2009 and ran until 10:00 p.m. (Stanec Dep. at 1666.) Shortly after she began her shift, Stanec was called to the third floor by corrections officers because an inmate was having a seizure. (*Id*. at 1665.)[6] When she arrived, she saw Platzer lying on the floor of his cell just coming out of a seizure. She observed that he was very disoriented and confused, had a superficial cut or scratch under his eye, and had

---

[4] Under jail policy, if anything abnormal occurs while an inmate is in pod 3A, the monitoring officers are required to complete an incident report. (Shay Dep. [Doc. No. 62] at 1466.)

[5] There is some evidence that she never actually wrote the report, but merely verbally informed the next medical assistant, Michelle Stanec, about Platzer's condition. (*See* Jordan Dep. at 950-51.)

[6] Stanec does not remember the exact time that this event occurred. However, shift notes suggest it happened during the dinner hours, which are anywhere from 3:30 to 5:00 p.m. (Stanec Dep. at 1730.) In addition, medication records indicate that Platzer received his first phenobarbital dose between 4:00 and 5:00 p.m., which would have been consistent with Stanec having called Malvasi for instructions. (*Id*. at 1669.)

4

urinated on himself. (*Id.* at 1664, 1670.) She and several officers entered Platzer's cell and they sat him up on his bunk, and she took his blood pressure.[7] She observed no evidence that he had struck any part of his body during the seizure.[8] Stanec then spoke to Malvasi by phone; he told her to start Platzer on the alcohol protocol medication immediately. Platzer was transported to the first floor medical department in a wheelchair and was allowed to shower and change clothes. (*Id.* 1664, 1670-71, 1673, 1720.) Rather than return him to his third floor cell, the officers placed Platzer in a booking cell, where he could be more easily observed since each cell contained a camera. (*Id.* at 1674.)

Stanec testified that Platzer was "fine" when he was in the booking area. (Stanec Dep. at 1676.) She went to his cell and asked him to sign a release so she could contact his mother to inquire about any history of seizures. Platzer wrote down his mother's telephone number for Stanec. (*Id.* at 1677.)[9] He seemed fine to Stanec at this time and he was fine for the rest of her shift.[10] She had no further contact with him before he died. (*Id.* at 1681.)

---

[7] At her deposition, Stanec indicated that she believed Platzer's blood pressure was normal at this time. (Stanec Dep. at 1673.) However, her progress notes from June 26, 2009 indicate that Platzer's blood pressure was 144/103, and she told the BCI investigator that Platzers vitals were high following his second seizure. (Doc. 73-1 at 2380.)

[8] Officer Anita Babcock, who was on duty in pod 3A saw Platzer fall forward and said he "fell like a tree," doing nothing to protect himself. (Babcock Dep. [Doc. No. 71] at 2129.) Babcock observed Platzer lying on his stomach, shaking on the floor. (*Id.* at 2130.) When Babcock entered the cell, she found that Platzer had urinated on himself and had blood on the right side of his mouth. (*Id.* at 2131.) According to an incident report completed by Babcock's partner, Officer Palumbo, "Platzer had blood coming from his mouth." (Doc. 63-6 at 1809.) Additionally, Babcock told the BCI investigator that she observed blood coming from Platzer's mouth at the time. (Doc. 73-1 at 2380.) While plaintiff's expert, Dr. James Knoll, could not rule out the potential for head trauma because of Platzer's second seizure, plaintiff's additional expert Dr. Cyril Wecht, indicates that, there is no evidence of any head trauma caused by this second seizure. (Knoll Dep. [Doc. No. 74] at 2475; Wecht Dep. [Doc. No. 56] at 638.)

[9] The Assistant Warden Nicole O'Brien suggested that Stanec contact Platzer's mother, who informed Stanec that at times, when Platzer was a teenager, he would "blank out." He was on medication for a short time, but stopped taking the medication and "that was it." (Stanec Dep. at 1677-78.) Stanec relayed this information to the assistant warden and to her medical supervisor, Carla. (*Id.* at 1681.)

[10] Around 5:30 p.m., Assistant Warden Nicole O'Brien spoke with Platzer and he reported to her that he was doing "good." He was coherent and did not appear to be experiencing alcohol withdrawal. O'Brien instructed the officers to allow him to shower and change clothes and then take him back to the third floor, where he could be monitored. (O'Brien Dep. [Doc. No. 61] at 1367-68.)

After Stanec left the jail when her shift was finished at 10:00 p.m., there was no medical coverage until 6:00 a.m. the next day. (Stanec Dep. at 1627.) This was pursuant to the contract between the jail and Malvasi. Malvasi testified that "[f]rom 10:00 p.m. until 6:00 a.m., I have no idea what the county does [with respect to observing the inmates in the medical cells]." He stated that "[i]f there's a problem with an inmate, they call." (Malvasi Dep. [Doc. No. 60] at 1266.) At no point during the overnight shift from June 26 through June 27, 2009 did any staff member contact Malvasi about Platzer. Nor do any of the jail logs in the record reflect that there was anything unusual happening with Platzer.

Annette Jordan worked the 2:00 p.m. to 10:00 p.m. shift on Saturday, June 27, 2009. When she came on duty, the daytime medical assistant (Jamie Brenner) reported that Platzer had experienced another seizure on June 26, that he was still on the alcohol protocol, and was still on the third floor. (Jordan Dep. at 976; Stanec Dep. at 1623.) During Jordan's shift, she had no problems with Platzer. She testified that when Platzer took his medication at 8:00 p.m., "[h]e was kind of shaky, sweaty, talking to me, standing at the door." (*Id*. at 983.) She clarified that his hands were shaking and he had beads of sweat on his face; but Jordan did not think he appeared to be going through alcohol withdrawal because "he was standing there and he was talking to me as if you and I were talking." (*Id*. at 985.) There is no indication that Jordan took Platzer's vital signs at this time. (*Id*. at 978-79.)[11] She did tell him that, if he could try to relax, he might feel better. Yet, when she left the floor, Platzer was still standing by his cell door. (*Id*. at 986.)

---

[11] Jordan testified that she does not remember whether or not she took Platzer's vital signs during her shift on June 27, 2009, but that she was supposed to because he was on the alcohol protocol. (Jordan Dep. at 978.) Nevertheless, it is undisputed that her progress notes from that day give no indication that she took Platzer's vital signs that day. (*Id*. at 979.)

Plaintiff contends that between 10:00 p.m. on June 27, 2009 and 6:00 a.m. on June 28, 2009, inmates overheard Platzer banging his head against the wall of his third floor cell. (Compl. ¶ 63.) One inmate heard him complaining of inability to breathe and that poison gases were coming from his toilet. (*Id*. ¶ 64.) Another inmate described Platzer as "delusional, incoherent, and in a panicked mind set[.]" (*Id*. ¶ 65.) This inmate stated that he knew "without being told that this was alcohol detox." (*Id*.) A third inmate reported that, during the evening of June 27, he was out of his cell making a phone call and, hearing a noise, looked into Platzer's cell and observed him banging his head against the wall. (*Id*. ¶ 66.) A fourth inmate allegedly stated that corrections officers observed all this behavior but took no action to help Platzer. (*Id*. ¶ 67.) No one from the jail attempted to contact Malvasi during this overnight shift. Officer Millik, who was on duty overnight, testified that Platzer was "awake and pacing the entire night" and "hallucinating." (Millik Dep. [Doc. No. 69] at 2029.) Millik stated that this was not unusual for inmates experiencing alcohol withdrawal. He testified that he viewed this behavior as so normal that, even if there had been medical personnel on site, he would not have called them. (*Id*.)

Adrienne Mackall worked the Sunday morning shift from 6:00 a.m. to 2:00 p.m. (Mackall Dep. [Doc. No. 59] at 1059.) At around 6:30 a.m., an officer asked her if she would see an inmate who "was a little banged up and . . . had a little bit of blood on his face and in his ear." (*Id*.) Officer Millik had called for the medical attention because Platzer "had just bitten his hand and was spattering blood everywhere." (Millik Dep. at 2032.)

Officers brought Platzer to the medical department. Mackall noted that Platzer had "some dried blood on his nose and in his ear." His blood pressure was elevated and he was sweating very badly. He was "a little bit out of it[,]" saying "[h]e wanted to go for a ride in his car." (*Id*. at 1060, 1064.) The officers reported that he had had no further seizures during the

7

night, but that he was "pulling on his teeth." (*Id*. at 1065.) Mackall saw this as a symptom of hallucinations or delusions. (*Id*. at 1066.) She felt that Platzer was experiencing delirium tremens. (*Id*. at 1069.)

Mackall called Malvasi and told him about Platzer's blood pressure, as well as the sweating, hallucinations, tremors, elevated heart rate, and dried blood in his ear. (Mackall Dep. at 1073-74.)[12] Malvasi ordered her to give Platzer some Catapress to treat the elevated blood pressure and to place Platzer on the list to see him on Monday.

After the phone call, which lasted about five minutes, Mackall unsuccessfully tried to give Platzer the Catapress. Mackall testified that Platzer just ignored her, appeared somewhat incoherent and to be hallucinating, and did not seem to know what she was saying. (*Id*. at 1074-76.) Mackall set the medicine aside for later, but did not call Malvasi to report that Platzer had not taken the medication. She asked the officers to return Platzer to his cell so she could complete her administration of medicines to the other inmates. (*Id*. at 1078.) Incident reports show that when the officers took Platzer back to his cell, they had an altercation with him and used a taser to drive stun him in the left buttock. (*Id*. at 1112 and Ex. 7.) Mackall, however, had no contemporaneous knowledge that this happened. (*Id*.)

Mackall next saw Platzer around 9:00 a.m., when she tried again to get him to take his medications. (Mackall Dep. at 1087.) Officers opened the door to his cell and she entered. She noticed that he "was scooting around on his knees, and he was just . . . kind of like karate chopping the air." (*Id*.) She considered the conduct to be further indication that Platzer was experiencing hallucinations. She also noted that he was mumbling incoherently. (*Id*. at

---

[12] Malvasi testified that Mackall told him there was dried blood "around the ear" and not "in the ear." He claims that had he known Platzer had blood in his ear, he would have ordered him sent to the emergency room immediately. (Malvasi Dep. at 1292-93.)

1089.) She tried to talk to Platzer, as did Officer Eckenrod, to convince him to take his medications, but Platzer was non-responsive. (*Id.* at 1095.) Mackall left, planning to call the doctor when she got back to the medical department.

Before Mackall could finish passing out the medications, she got a call that Platzer was in his cell with a sheet wrapped around his neck. (Mackall Dep. at 1095.) By the time she got to his cell, the officers had him standing up and were cuffing him and laying him face down on his bunk. That is when they noticed he was not breathing. (*Id.* at 1096.) The officers uncuffed Platzer and carried him out to the floor outside his cell, where Eckenrod, who was trained as an EMT, started CPR. Mackall took his blood pressure and his blood oxygen readings. After about fifteen minutes, the MedStar ambulance arrived and took over Platzer's care. (*Id.* at 1096-97, 1103.) He was taken to St. Joseph Hospital and died the following day as a result of a head injury.

Although a post-mortem BCI investigation report show that officers reported "a huge blood clot under the nose of Platzer and [that] he was bleeding from his left ear[]" and that "there was blood from his ear down his neck, his shoulder, and his breast and leg of his jail uniform[,]" Mackall denies observing any of this or even being told that others had observed it. (*Id.* at 1119-20.) The BCI investigation also states that officers reported that Platzer was attempting to pull out his teeth, complained that he had metal rods in his mouth, wanted his keys so he could go home, and was pulling on his tongue. (*Id.* at 1120.) Mackall denies any contemporaneous knowledge of any of this. (*Id.*)  The BCI investigation further reported that Officer Millik stated that, around 6:00 a.m., Platzer was "chewing on his hands and blood was all over his mouth, chin, fingers, and his left ear." (*Id.* at 1121.) Mackall denies that any of this was

reported to her. (*Id*.) In her view, her observation of Platzer on the morning of June 28 showed "typical" symptoms of alcohol withdrawal. (*Id*. at 1132-33.)

Assistant Warden Eric Shay had also gotten involved with Platzer on June 28, 2009. At about 6:00 a.m. or so, Officer Berkinyi called Shay, reporting that they had an inmate who needed to go to medical and asking whether they should take the inmate down or have medical come up. Shay advised Berkinyi to do whatever the medical personnel thought was best. (Shay Dep. [Doc. No. 62] at 1446.) Subsequently, Shay was told that Platzer had "bleeding out of his ears." (*Id*.) He thought that was so unusual that he called Mackall, who informed him that she was waiting to hear back on a call she had placed to Malvasi, but that she did not think Platzer's condition was serious. Shay sensed something was not right and decided to call Malvasi directly. When he got through to the doctor, Shay told him he was concerned that Platzer was potentially bleeding out of his ears. (Shay Dep. at 1457.) Malvasi assured Shay that Mackall had checked out Platzer and reported that the blood was dried, "consistent with something superficial." (*Id*.)  Malvasi did not think it was anything to be concerned about. (*Id*. at 1447-48, 1453.) As Shay was discussing this with Malvasi, the call came to go to the third floor because Platzer had a sheet wrapped around his neck. Shay discontinued his conversation with Malvasi and ran to the third floor. (*Id.*)

The Trumbull County Coroner identified the cause of Platzer's death as "blunt craniocerebral trauma" which was "most likely due to a fall while in acute alcohol withdrawal." (Doc. 55-5 at 591.)

10

## II. DISCUSSION

### A.      Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Rule 56(e)(2). Affidavits filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Rule 56(e)(1).

### B.      Analysis

In their motion for partial summary judgment, defendants Malvasi, Jordan, Stanec, and Mackall argue that the uncontroverted evidence demonstrates they were not deliberately indifferent to Platzer's serious medical needs. They move for summary judgment on plaintiff's § 1983 claim in the first cause of action.[13]

---

[13] The first cause of action, which is the § 1983 claim, alleges that these four defendants deprived Platzer of rights secured by the eighth and fourteenth amendments, including but not limited to the right to adequate medical care and to be free from excessive force. (Compl. ¶ 120.) It alleges that Jordan, Stanec and Mackall were each deliberately indifferent to Platzer's serious medical condition, failing to provide the medical care that the condition required. (*Id.* ¶ 121.) It further alleges that Malvasi failed to adequately train and supervise jail corrections officers and medical staff in (1) the intake, diagnosis and corrections and medical care of inmates who arrive at the jail at risk of withdrawal and skull fractures (*Id.* ¶ 122); and (2) regarding the use of tasers against inmates suffering from alcohol withdrawal, thereby being deliberately indifferent to the safety of inmates suffering from alcohol withdrawal (*Id.* ¶ 124).

11

1.      *Deliberate Indifference Standard*

There is no dispute that failure to provide necessary medical treatment to prisoners constitutes a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. To establish the violation, plaintiff must demonstrate that defendants were deliberately indifferent to a detainee's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Deliberate indifference has been defined as "more than mere negligence, but 'something less than acts or omissions for the very purpose of causing harm or knowledge that harm will result.'" *Foy v. City of Berea*, 58 F.3d 227, 232 (6th Cir. 1995) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1979)).

Deliberate indifference occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 838. Thus, the deliberate indifference standard contains both an objective and a subjective component. *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004). The objective component addresses whether the deprivation was "sufficiently serious," *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992), and the subjective component addresses whether the officials acted with "a sufficiently culpable state of mind." *Id*. To establish the subjective component, however, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.[14]

---

[14] Personal liability based on the subjective component, however, "must be based on the actions of [each] defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others, either defendants or non-defendants." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). "The focus must be on whether any of the defendants had the personal involvement necessary to permit a finding of liability." *Clark-Murphy v. Foreback*, 439 F.2d 280, 291 (6th Cir. 2006) (quoting *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (internal citations omitted).

> The federal courts have also held that less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases. For example, the Eleventh Circuit has held that "deliberate indifference may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999) (a doctor's awareness that plaintiff's condition was deteriorating and subsequent failure to treat plaintiff could support a finding of deliberate indifference); *see Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir. 1989) (a doctor's decisions to remove patient from medication and to restore the medication without Lithium constitutes deliberate indifference to patient's psychiatric condition). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe,* 888 F.2d 783, 789 (11th Cir. 1989) (a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg constitutes deliberate indifference); *Cooper v. Dyke,* 814 F.2d 941, 945-46 (4th Cir. 1987) (a prison employee's two-hour delay in providing medical care to an inmate known to have gunshot wounds constitutes deliberate indifference).

*Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). Relying on the Eleventh Circuit's holding in *Waldrop*, the court in *Terrance* reversed in part a district court's grant of summary judgment and remanded "to send the plaintiff's claims against [certain medical staff] to trial to determine whether any of these defendants had a deliberate indifference to the decedent's serious medical needs under the 'grossly inadequate care' standard." *Id*. at 847.

As to whether there was an objectively "serious medical need," the Court concludes that plaintiff has produced sufficient evidence to demonstrate the objective element of her deliberate indifference claims against the defendants. The Sixth Circuit has "recognized that delirium tremens constitutes a serious medical need" sufficient to satisfy the objective prong of

the deliberate indifference standard. *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (citing *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)). Although Malvasi testified that an inmate experiencing seizures while in alcohol withdrawal did not have a serious medical need, (Malvasi Dep. at 1197-98), even his own expert disagreed. (*See* Smith Dep. [Doc. No. 72] at 2207-10). Malvasi may have considered delirium normal during alcohol withdrawal;[15] however, plaintiff's expert, Dr. Knoll, noted in his report that delirium is "a life-threatening medical emergency with a mortality rate of approximately 20%." (Knoll Report [Doc. No. 74-2], at 2558.) Indeed, defendant's own expert testified that the danger of uncontrolled alcohol withdrawal that has advanced to delirium tremens is complete cardiovascular collapse. He characterized that danger as within the 5 percent range. However, he acknowledged that seizures associated with alcohol withdrawal are fairly common (Smith Dep. at 2209-10) and, if a patient is suffering delirium, his medication should be increased or he should be sent to the hospital (*Id*. at 2221).  Viewed in a light most favorable to plaintiff, the Court concludes the evidence is sufficient to demonstrate that Platzer suffered from a serious medical need. The issue for the Court then is whether the defendants individually were subjectively aware of facts from which they could each infer that a substantial risk of serious harm existed to Platzer, and that each drew that inference and then disregarded the risk.

  *2. Application of Eighth Amendment Standard to All Defendants*

  a. Medical Assistant Annette Jordan

    The Court finds that the evidence in the record, even when taken in a light most favorable to plaintiffs, does not establish that Jordan subjectively appreciated the serious medical

---

[15] (Malvasi Dep. at 1295: "[I]t's common that these guys, like I said, they come in, they hallucinate, they sweat, they have tremors.")

risks to Platzer. Moreover, even if Jordan was aware of facts from which it could be inferred that a substantial risk of serious harm existed to Platzer, plaintiff failed to produce sufficient evidence that Jordan disregarded that risk. It is undisputed that after Platzer suffered his first seizure in Jordan's presence, she promptly checked his vital signs and contacted Malvasi for guidance, reporting that Platzer smelled of alcohol, had elevated vitals, and had a seizure. He advised her to start Platzer on the alcohol protocol at the next medication pass (which would begin at the next medication pass at 8:00 p.m.) and to take Platzer to the third floor for frequent observation. It is unquestionable that Jordan complied with these orders.

Jordan did not see Platzer again until her next shift on June 27, 2009, when she made her medication pass on the third floor around 8:00 p.m. Although Jordan was aware that Platzer had experienced a second seizure the previous day and appeared to be sweaty and shaky, there is no indication she was aware of he was experiencing symptoms as severe as or more severe than those that he had exhibited previously. Indeed, Jordan testified that she had no issues with Platzer, that he took his mediation without resistance or problems, and that he did not appear to be going through alcohol withdrawal. Further, no issues with Platzer arose during the remainder of Jordan's shift that would have alerted her that his condition was deteriorating.

Plaintiff faults Jordan for failing to check Platzer's vitals during her second shift. However, while this deficiency may have been negligent, mere negligence is not enough to demonstrate that Jordan was deliberately indifferent. *Finn v. Warren Cnty. Ky.*, No. 1:10-CV-00016-JHM, 2012 WL 3066586, at *14 (W.D. Ky. July 27, 2012) (finding no deliberate indifference where nurse failed to check on inmate during first three hours of her shift even though she was aware he was shaking and going through alcohol withdrawal when she was

15

unaware of any  more severe symptoms) (citing *Stefan v. Olson*, No. 1:10 CV 671, 2011 WL 2621251, at *11-12 (N.D. Ohio July 5, 2012)).

No reasonable jury would infer from the facts presented that Jordan was aware of, and disregarded, a serious medical risk to Platzer. Jordan was certainly aware that Platzer was detoxing, but Platzer did not exhibit odd behavior or delusions during either of Jordan's shifts that would have alerted her to a serious risk to his health and safety. Further, it is undisputed that even if she had perceived facts from which a serious risk could be inferred, she had no independent authority to diagnose or treat Platzer, since that responsibility fell entirely to Malvasi. It is clear from the record that she consulted with Malvasi and complied with his prescribed protocol. There is no evidence that Platzer's condition had changed or deteriorated such that it would have alerted her that he might have needed more rigorous care. Accordingly, a reasonable jury could not conclude that Jordan subjectively perceived a substantial risk to Platzer, much less that she disregarded such a risk. As such, the Court grants defendants' motion for summary judgment insofar as it applies to plaintiff's deliberate indifference claim against Jordan.

b. Medical Assistant Michelle Stanec

Plaintiff has also not produced sufficient evidence that Stanec was deliberately indifferent towards the rights of Platzer. Although there is some evidence that Stanec was aware of facts, from which she could have inferred that a substantial risk of serious harm existed, there is insufficient evidence that she did in fact draw that inference or that she disregarded a known risk. Stanec was aware that Platzer was going through alcohol withdrawal and was instructed by Jordan to start Platzer on the alcohol protocol. Shortly before her shift started, she was called to the third floor because Platzer had a second seizure. Stanec observed that Platzer was lying on

16

the floor just coming out a seizure, but other than a cut or scratch under his eye, she was unaware that he had struck any part of his body during the seizure. She checked his vitals and called Malvasi to report her observations and for direction. He instructed her to start Platzer on the alcohol protocol immediately and to give him an anti-seizure medication, which she did. Platzer took his medication with no problems, showered, changed his clothes, and was then placed in a booking cell with a video camera so that he could be observed more closely. Stanec obtained from Platzer a medical release and his mother's telephone number, who she called to inquire about his medical history. At that time, Platzer appeared fine to her. From that point on, it is unclear from the record whether Stanec checked on Platzer again during her shift, yet the officers reported to her that he was doing fine and, as far as she was aware, they were closely observing him.

Plaintiff contends Stanec was deliberately indifferent because she did not assess Platzer for a head injury when he suffered his second seizure and because she did not check Platzer's vitals before leaving at 10:00 p.m. on June 26, 2009. Yet, there is no indication in the record that Stanec was aware that Platzer had struck his head. Indeed, Babcock was the only person to observe Platzer 'fall like a tree,' but there is no evidence that she ever conveyed this information to Stanek. Additionally, plaintiff's own expert opined that it was unlikely that Platzer suffered a head injury because of his second seizure. (Wecht Dep. at 638.) Further, similar to Jordan, Stanec had no independent authority to diagnose or treat Platzer, since that responsibility fell entirely to Malvasi. Again, it is clear from the record that Stanec consulted with Malvasi and complied with his prescribed protocol. Again, as with Jordan, Stanec's arguably negligent failure to recheck Plazter's vitals or to check-in on him again, does not rise to the level of deliberate indifference. Especially when there is no evidence that she received any

17

reports that Platzer was not responding to the medication or that his condition was worsening or had become life threatening. On these facts, no reasonable jury could find that Stanec was aware of and disregarded a serious risk to Platzer's health and safety. Consequently, defendants' motion for summary judgment as to the deliberate indifference claim against Stanec is granted.

c. Medical Assistant Adrienne Mackall

Although a close call, the Court finds that plaintiff has presented sufficient evidence from which a reasonable juror could conclude that Mackall was aware of a substantial risk to Platzer and that she disregarded the risk when faced with a need for treatment that was obvious. As with Jordan and Stanec, Mackall was aware that Platzer was withdrawing from alcohol and was on the alcohol protocol, but unlike Stanec and Jordan, issues of fact remain as to whether Mackall disregarded a substantial risk of serious harm to Platzer.

Shortly after Mackall's shift began at 6:00 a.m., Platzer was brought to medical for an evaluation. At that time, she observed blood on his nose and in his ear, that his vitals were elevated, and that he was sweating and incoherent. She indicated that she was aware that Platzer was experiencing delirium tremens. Although Mackall purportedly reported all of these symptoms to Malvasi and was ordered to start Platzer on a blood pressure medication, the record reveals that she failed to report to Malvasi that Platzer, in a hallucinogenic state, refused his medications. According to Malvasi, Mackall also failed to report to him that Platzer had blood in his ear, which would have suggested a possible head injury to him and would have triggered a trip to the hospital.

When Mackall returned to Platzer's cell around 9:00 a.m., she observed him acting erratically and mumbling incoherently, which she considered to be further indication that Platzer was hallucinating. However, she left to finish passing out medications to the other

18

inmates and again failed to report to Malvasi that Platzer had again refused his medications. As a result, according to defendants' own medical expert, when Platzer was finally transported to the hospital, he did not have a therapeutic level of phenobarbital in his system. (Smith Dep. at 2219.)

In short, Mackall knew that Platzer was suffering from delirium tremens, yet she did nothing when he refused to take needed medications. On these facts, a reasonable jury could find that Mackall was aware of and disregarded a serious risk to Platzer's life. Therefore, defendants' motion for summary judgment as to plaintiff's deliberate indifference claim against Mackall is denied.

d. Dr. Philip Malvasi

As a preliminary matter, the Court will address defendants' contention that plaintiff failed to plead that a deliberate indifference claim against Malvasi for his direct actions. (Doc. No. 76 at 2573.) According to defendants, the complaint *only* alleges that Malvasi failed to train his medical staff and the corrections officers and not that he was *directly* indifferent to Platzer's serious medical needs.

The Court concludes, however, that when read as a whole and in a light most favorable to plaintiff, the complaint contains sufficient allegations to place defendants on notice of plaintiff's claim for deliberate indifference against Malvasi. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 44, 47 (1957). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing authorities).

19

Here, while the allegations regarding Malvasi in the complaint's "First Cause of Action – 42 § 1983"[16] are limited to his purported failure to train the jail's corrections officers and the medical staff, there are other allegations contained in the complaint that are sufficient to put Malvasi on notice that his direct treatment of Platzer was at issue relative to plaintiff's § 1983 claim. For instance, the complaint alleges that Mackall told Malvasi that Platzer was bleeding from ears and that Malvasi was aware that this was symptomatic of a fractured skull and severe brain trauma, but that he failed to personally examine Platzer and to diagnose and treat his bleeding from the ear or his symptoms of alcohol withdrawal. (*Id*. at 15, ¶¶ 74-77.) The complaint further alleges that "[t]he failure by *Defendants* to diagnose and treat the alcohol withdrawal symptoms and skull fracture of Mr. Platzer was . . . deliberately indifferent to the serious medical needs of Mr. Platzer." (*Id*. at 19, ¶ 105.) *See also, id.* at 19 ¶ 110 (indicating "[a]ll Defendants, including . . . Malvasi . . . were . . . deliberately indifferent . . . ."). These factual allegations plausibly give rise to a claim of deliberate indifference against Malvasi. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Moreover, defendants' alleged lack of notice as to plaintiff's deliberate indifference claim against Malvasi is belied by the fact that this issue has been both the subject of fact and expert discovery. So, although the plaintiff was admittedly sloppy in her pleading, the Court finds that this claim cannot be a surprise to Malvasi.

Turning now to the application of the subjective prong of the deliberate indifference standard to Malvasi, it cannot be said that there are no material facts in dispute with respect to whether the Malvasi exhibited deliberate indifference to Platzer's serious medical need. There seems to be no dispute that Platzer was already suffering alcohol withdrawal when he arrived at the jail. There is, however, a dispute over whether Malvasi's original decision to

---

[16] (Doc. No. 1 at 21-23, ¶¶ 120-124.)

wait about seven hours before administering the first dose of phenobarbital,[17] in the face of a known seizure and elevated vital signs in a person who declared himself to be "a drunk," led to a second seizure and Platzer's ever-deteriorating condition. (*Compare*, Litt Dep. [Doc. No. 55] at 451, 455-56 (asserting that the initial steps taken were inadequate and untimely) *with* Smith Dep. at 2205-07 (initial diagnosis and treatment was appropriate)[18].) There is a further dispute over whether, after Malvasi was informed that Platzer suffered a second seizure within about three hours of the first and was also informed that blood was observed in or around Platzer's ear, it was sufficient to simply administer medications without sending Platzer to the hospital or, at the very least, subjecting him to closer monitoring. (*Compare*, Litt Dep. at 479-80 (the blood should have triggered a more thorough and immediate examination to ascertain its source) *with* Smith Dep. at 2261 (although blood coming out of one's ear might indicate a brain injury, the record was conflicting on where the blood was, on whether it was fresh or dried, and on whether its presence was properly communicated to Malvasi).)

Additionally, it is disputed whether Malvasi was aware of Platzer's rapidly worsening condition on June 28, 2009. Malvasi conceded that blood in Platzer's ear would have suggested a possible head injury and would have definitely triggered a trip to the hospital. Mackall claims she told Malvasi about the blood in the ear and that he was pulling on his teeth trying to get "metal rods" out of his mouth. Malvasi disputes this, indicating that she told him

---

[17] There is even a dispute over whether phenobarbital was an outdated form of treatment for alcohol withdrawal. (*Compare* Litt Dep. at 425-26 (for 20 years benzodiazapines have been preferable to phenobarbital for treatment of alcohol withdrawal) *with* Smith Dep. at 2217 (both drugs are appropriate, although benzodiazapine may be used more frequently simply because it has fewer side effects).)

[18] Although Smith testified that the initial diagnosis and treatment were adequate, he also conceded that it is not the standard of care to wait several hours to administer the first dose of medication to a person in alcohol withdrawal. However, he believed the delay was due to a miscommunication between Malvasi and his medical assistant. (Smith Dep. at 2233.)

21

about the blood around Platzer's ear. Thus, issues of fact remain as to whether Malvasi was aware of and disregarded a substantial risk of harm to Platzer.

Moreover, the alcohol protocol, which Malvasi had established at the time, did not require regular monitoring of an inmate's vital signs. (*See* Doc. No. 63-4.) Malvasi testified that, once an inmate is on the protocol, taking his vital signs would not make a difference.[19] However, defendants' own expert disagreed regarding the importance of monitoring vitals, saying that "[i]t's one of the things you monitor for[ ]" with a person undergoing alcohol detoxification. (Smith Dep. at 2220.) In addition, Carla Ahart, the meds-certified licensed practical nurse who supervised the medical assistants, testified that an inmate undergoing alcohol withdrawal should be reassessed "[a]t least once a shift. And when needed." The "when needed" was determined by "their behavior." (Ahart Dep. [Doc. No. 54] at 343.) Yet, there are factual disputes throughout the record over whether Malvasi had an adequate communication system in place for properly assessing an inmate such as Platzer's condition or that Malvasi ever even inquired further as to Platzer's vital signs when he did speak to his medical staff.

In light of the foregoing, the Court concludes that a jury could find that Malvasi's actions (or inaction) amounted to deliberate indifference to Platzer's serious medical needs when analyzed under the "grossly inadequate care" standard. *Terrance*, 286 F.3d at 843-44. A reasonable jury could decide that a reasonable doctor in Malvasi's position would have concluded that a substantial risk of serious harm to Platzer existed. Further, a reasonable jury could determine that Malvasi provided care that was "so cursory as to amount to no treatment at all."

---

[19] (Malvasi Dep. at 1296) ("You're asking me if one set of vital signs makes a difference in this case, or two, or three, or four. Not at all. . . . The inmate was started on his protocol. . . . There's nothing else that could have been done, other than putting this guy in a helmet, or reporting to me that something should have been done with him hitting his head.")

2.      *Failure to Adequately Train and Supervise (Against Malvasi)*

Plaintiff also alleges that Malvasi failed to adequately train and supervise both his medical assistants and the corrections officers. In particular, plaintiff asserts that Malvasi did not have in place a system for gathering information to equip him with the data he needed to make treatment decisions. There is no evidence in the record to reflect that Malvasi attempted to train his own medical assistants and the danger of that failure is reflected in Stanec's answer that she was "not sure" when asked whether alcohol withdrawal can result in death. Thus, as far as plaintiff alleges Malvasi failed to adequately train his medical staff and implemented an alcohol protocol that was deliberately indifferent to inmate's serious medical needs, the Court finds there are material issues of fact which preclude summary judgment.

With regard to the failure to train the corrections officers, however, the Court concludes that defendants' are entitled to summary judgment. While the corrections officers admittedly never received any training or guidance regarding recognizing and taking care of inmates with alcohol withdrawal,[20] there is simply no evidence in the record that *Malvasi* was responsible for providing such training or for writing or implementing the jail's policies and procedures in this regard.[21] Additionally, there is no evidence that he had control over the officers, such that he could have required them to attend training or that he could sanction them for not attending. Moreover, plaintiff has not cited to any authority for her argument that a private physician contracting to provide medical services at a jail also has a duty to train that facility's corrections officers absent an express contractual agreement to do so. Further, although

---

[20] (Millik Dep. at 2055; Eckenrod Dep. [Doc. No. 57] at 842-43; Berkinyi Dep. [Doc. No. 68] at 2004; Babcock Dep. [Doc. No. 71] at 2161; Shay Dep. at 1495-96.)

[21] Indeed, the Trumbull County Sheriff's Office policies and procedures regarding intoxication and withdrawal, chemically dependent inmates, and infirmary care have effective dates of October 1, 1997, more than two years before Malvasi was contracted to provide medical services at the county jail. (Doc. 62-8 at 1591-1597; Malvasi Dep. at 1159.) Moreover, Shay testified that Malvasi has never requested that any policies or practices be changed at the jail. (Shay Dep. at 1497-98.)

plaintiff makes much of the fact that Malvasi failed to provide services during the midnight shift at the jail, it is undisputed that Malvasi was not contracted by the jail to provide services during that shift. Accordingly, plaintiff has failed to demonstrate that Malvasi has supervisory liability for the actions or inactions of the county correction officers. *Miller v. Calhou Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) ("Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability.")

### III. CONCLUSION

For the reasons set forth herein, defendants' motion for partial summary judgment (Doc. No. 52) is **GRANTED in part and DENIED in part**. Defendants' motion for summary judgment is granted as to that portion of plaintiff's § 1983 claim alleging Malvasi failed to train and supervise the corrections officers. Further, defendants' motion for summary judgment is granted as to plaintiff's deliberate indifference claims against defendants Jordan and Mackall. The remainder of defendant's motion for summary judgment is denied.

The Court will proceed as planned with the Final Pretrial Conference on August 8, 2012.

**IT IS SO ORDERED**.

Dated: August 8, 2012

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**